UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


DAVID CHRISTENSEN and CHRISTINE    )
V. SHEA,    )
    )
                Plaintiffs,    )    No. 10 C 2177
    )
        v.    )
    )    Magistrate Judge
FIFTH THIRD BANK, and NATIONAL    )    Arlander Keys
CITY BANK,    )
    )
                Defendants.    )


**MEMORANDUM OPINION AND ORDER**

David Christensen and his wife, Christine Shea, reside at 738 Bonaventure Drive in Oswego, Illinois. In 2007, they refinanced the property with a loan from Fifth Third Bank. In 2010, when they brought their closing file to an attorney, they realized that there may have been some issues with the closing. On April 8, 2010, they sued, alleging that Fifth Third violated the Truth In Lending Act in several ways. More specifically, the plaintiffs alleged that Fifth Third failed to provide the requisite number of copies of the Notice of the Right to Cancel; included the wrong date on that notice; failed to provide accurate information on the TILA statement; and failed to take steps to rescind the contract once the plaintiffs exercised their right to cancel the transaction.

The parties consented to proceed before a United States Magistrate Judge, and the case was reassigned to this Court on

September 22, 2010.  Thereafter, the parties filed cross motions

for summary judgment; the Court determined that material issues

of fact concerning the particulars of the closing prevented

summary judgment and denied both motions.  The Court then held a

one-day bench trial on April 16, 2013.  The following opinion

constitutes the Court's findings of fact and conclusions of law

pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.[1]

FINDINGS OF FACT

A.  Background

In December 2006, Christine Shea purchased a home located at

738 Bonaventure Drive in Oswego, Illinois.  Shortly thereafter,

she married David Christensen and, together, they combined their

families to reside in the home with their five children.  In

April of 2007, Ms. Shea[2] and Mr. Christensen decided to refinance

the mortgage on the Bonaventure home to get a better interest

rate.  They worked through a broker, who advised them that they

would not be required to pay closing costs.  Yet, when they

arrived at the closing, on April 10, 2007, they were advised

otherwise.  They considered walking away, but ultimately decided

---

[1]To the extent certain findings may be deemed conclusions of
law, they shall also be considered conclusions.  Similarly, to
the extent matters contained in the conclusions of law may be
deemed findings of fact, they shall also be considered findings.

[2]Ms. Shea changed her name to Christensen in January 2007,
but she has consistently used Shea in this case, so the Court
will use Shea here as well.

to go ahead with the transaction.  They agreed to bring the required closing costs back at a later date and proceeded with the closing.  While at Chicago Title on April 10, 2007, the plaintiffs signed, dated and/or initialed various documents associated with the closing, including a HUD-1 settlement statement, a TILA Disclosure Statement, a Notice of Right to Cancel, a Mortgage, a Note, certain tax documents, a uniform residential loan application, an affidavit of occupancy, a quit claim deed, etc.  *See* Plaintiffs' Group Exhibit 1.

The closing, expected to last 60 to 90 minutes, instead lasted several hours.  And there were other issues that made the closing, in the Christensens' view, sketchy.  For example, although they were initially told that they would be required to pay more than $5,000 in closing costs, that number was reduced to a little over $3,300 when they balked.  Additionally, there were no documents ready when they arrived at the closing, and the documents, when they did come in, came in dribs and drabs. Finally, when they left the closing, they left without any documents.  Ms. Shea returned on April 16th, tendered the required closing costs and was given an envelope of closing documents, which she then stored in the couple's home.

Mr. Christensen and Ms. Shea made payments consistent with the refinanced mortgage for a little over a year.  But the closing left a bad taste in their mouth, and when someone

suggested to them that something may have been off about the transaction, they decided to consult an attorney. They brought their closing documents to Attorney Douglas Matton, who reviewed them and determined that there were, in fact, problems with the documents. Mr. Christensen and Ms. Shea advised their attorney to pursue whatever remedies were available to them under the law. And, to that end, Mr. Matton's office sent a letter to Fifth Third on July 9, 2008, advising the bank that Mr. Christensen and Ms. Shea were rescinding the loan "because of your failure to comply with the Truth In Lending Act and its implementing regulations . . . including but not limited to the failure to provide my client with mandated Truth In Lending disclosures related to this transaction." Defendant's Exhibit 2, p. 1 (July 9, 2008 Letter from Matton & Grossman to Fifth Third Bank). Fifth Third received the letter on July 11, 2008. Yet Fifth Third took no steps to rescind the transaction; nor did it initiate further contact with Mr. Matton or the borrowers. Instead, Fifth Third initiated foreclosure proceedings on the Bonaventure house based upon the couple's failure to make the monthly payments required under the refinanced mortgage.

On April 8, 2010, Mr. Christensen and Ms. Shea sued Fifth Third, seeking rescission and damages. In their complaint, they alleged that Fifth Third violated the TILA in several ways involving the Notice of the Right to Cancel and the TILA

Statement prepared by Fifth Third and provided to them in connection with the closing of the refinancing transaction. More specifically, the plaintiffs alleged, the bank failed to provide the requisite number of copies of the notice of the Right to Cancel; included the wrong date on that notice; failed to provide accurate information on the TILA statement; and failed to take steps to rescind the contract once the plaintiffs exercised their right to cancel. With regard to the TILA statement, the plaintiffs alleged in their complaint that Fifth Third

> failed to deliver to PLAINTIFFS, all "material" disclosures required by the Act and Regulation Z including the following:
>
> A.   By failing to properly and accurately disclose the "amount financed," using that term in violation of Regulation Z §226.18(b) and 15 U.S.C. §1638(a)(2)(A).
> B.   By failing to properly and accurately disclose the "finance charge," using that term, in violation of Regulation Z §§226.4 and 226.18(d) and 15 U.S.C. §1638(a)(3).
> C.   By failing to clearly and accurately disclose the "annual percentage rate," using that term, in violation of Regulation Z §226.18(e) and 15 U.S.C. §1638(a)(4).
> D.   By failing to properly disclose the number, amounts, and timing of payments scheduled to repay the obligation, in violation of Regulation Z §226.18(g) and 15 U.S.C. §1638(a)(6).
> E.   By failing to properly and accurately disclose the "total of payments," using that term, in violation of Regulation Z §226.18(h) and 15 U.S.C. §1638(a)(5).

Complaint, ¶23. Fifth Third answered the complaint, denying that it in any way violated the TILA.

At the final pretrial conference, Mr. Matton, still acting as counsel for the plaintiffs, indicated that they were proceeding to trial on just one claim: the claim based upon Fifth Third's failure to effect the rescission once the plaintiffs exercised their right to cancel the transaction. The plaintiffs withdrew the remainder of their claims, those relating to the discrepancies in the closing documents. Based upon this concession, plaintiffs' counsel represented that the plaintiffs were seeking $8,000 on that claim – down from the over $36,000 they had previously been seeking. In addition, the plaintiffs were seeking the return of any money they paid on the mortgage, which amounted to just under $28,000.

B.    The Trial

The Court held a bench trial in the case on April 16, 2013. At trial, the plaintiffs both testified about the closing, as well as the events leading to the filing of the lawsuit. The Court heard first from Christine Christensen, formerly Christine Shea.

Ms. Shea testified that she married Mr. Christensen in January 2007 and changed her name at that time to Christine Christensen. Trial Transcript ("Tr.") at 20. She testified that she and her husband have five children, though only three are her biological children. Tr. at 21. She testified that she resides at 738 Bonaventure Drive in Oswego, Illinois. Tr. at 20. She

testified that she is currently a stay-at-home mom, and that she last worked in approximately March of 2011. Tr. at 21.

With regard to her employment history, Ms. Shea testified that, at the time of the closing, and for about twelve years before that, she worked as a customer service manager for Westfalia Surge. Tr. at 22. She testified that, at the time of the closing, she was making about $70,000/year. *Id.* She testified that her husband was also working, making about $65,000/year. Tr. at 22-23.

Ms. Shea testified that, in April 2007, she and her husband decided to refinance their home mortgage to reduce their interest rate. Tr. at 21. She testified that she and her husband were referred to a mortgage broker named Marianne Kuczynski, and they decided to use her for the transaction because she told them they could do the refinance with no closing costs. Tr. at 21-22. She testified that the refinance transaction was set to take place at Chicago Title Company, in their Naperville office. Tr. at 23. She testified that the office was about a block from where she worked at the time, and that she met her husband there; she testified that she arrived around 1:00 p.m. and that he arrived around 1:20 p.m. Tr. at 23-26. Ms. Shea described the building, the parking lot and the inside of the offices in detail. Tr. at 25-28.

She testified that, after waiting a few minutes, their

broker came out and escorted them back to a conference room; she testified that there were no documents in the room when they arrived. Tr. at 28. She testified that, after about 15 minutes, their broker came into the room and told them there was a problem with the closing; she testified that, at that time, the broker told them they would have to pay over $5,000 to close that day. Tr. at 29. She testified that this came as a surprise, because they had been told through the whole process that there would be no closing costs. Tr. at 29. She testified that, because of this, she and her husband considered cancelling the entire deal; they decided, in the end, however, to proceed, and their broker was able to get the costs down to a little over $3,000. Tr. at 29-30. She testified that, after discussing the matter with their broker and the closing agent, they agreed that they would proceed with the closing and that they could come back with the money another day. Tr. at 30. Ms. Shea testified that they then proceeded with the closing.

With regard to the transaction, Ms. Shea testified that, after they decided to go through with the closing, there was "a lot of scrambling," with people coming in and out of the room; she testified that, after about 30 minutes, "documents started showing up on the table." Tr. at 30-31. She testified that the documents came in at different times, not all at once, and that they were told to start signing the documents as they came in;

she testified that there were stickers indicating where they needed to sign and that they simply signed where they were told to sign. Tr. at 32.

She testified that, from the time they got to Chicago Title to the time documents started showing up in the conference room, about two hours had passed.  Tr. at 31.  She testified that, in total, they spent about three and a half hours at Chicago Title that day.  Tr. at 33. She testified that, in her experience, this is highly unusual; closings, in her experience, typically take about an hour or maybe an hour and 15 minutes.  Tr. at 31.  She testified that she and her husband left the closing feeling "deflated" because the transaction had not gone the way they had expected it to go; she testified that they left there with nothing and that she knew she still had to come back with a cashier's check, which she planned to do as soon as they got paid again.  Tr. at 33.  She testified that she did, in fact, return to Chicago Title on April 16, 2007 to deliver the cashier's check; she testified that, at that time, she was given an envelope containing what she assumed were the closing documents. Tr. at 35-36.

Ms. Shea testified that, after leaving Chicago Title, she took the envelope of documents home and put it in the file cabinet in their home office.  Tr. at 37.  She testified that she did not open the envelope and that she never added or removed

documents from the envelope. Tr. at 37.

Ms. Shea testified that, after the closing, she and her husband made 13 payments on the loan. Tr. at 37. She testified that, at some point later, in the summer of 2008, she and her husband met with an attorney; at that point, they went through all the closing documents and realized that there may be some problems. Tr. at 38. First, she testified, they realized that their closing packet contained just two copies of the notice of right to cancel. Tr. at 38. Ms. Shea also testified that they received the closing documents on April 16, 2007, yet the notice of right to cancel stated that they had until midnight on April 13, 2007 to cancel; she testified that, after reviewing the documents, she was confused about whether they could cancel the transaction. Tr. at 39. She testified that, after going over the documents with their attorney, she and her husband were also confused about how much they actually borrowed; she testified that the documents reflected different amounts on this issue. Tr. at 43-44. She testified that, after realizing there were problems with the documents, she and her husband instructed their attorney to do everything he could to cancel the loan; she testified that the decision to proceed with rescission had nothing to do with their financial situation or their ability to make payments; she testified that they just always sort of thought the transaction was sketchy and that they wanted to undo it if they could. Tr. at

44, 67-68.

She testified that, after their attorney sent a rescission letter to Fifth Third, Fifth Third took no steps to cancel the transaction; on the contrary, they actually instituted foreclosure proceedings. Tr. at 45. Finally, Ms. Shea testified that she and her husband want to keep their home and that, if the transaction is cancelled, they are prepared to return the loan proceeds to Fifth Third; she testified that, although she has stopped working since the April 2007 closing, her husband's income has steadily increased, such that their combined income is actually greater now than it was then. Tr. at 45-46.

Mr. Christensen testified next. He testified that he lives on Bonaventure Drive with his wife, Christine. Tr. at 76. He testified that he and his wife refinanced their home in April 2007 to get a better interest rate. Tr. at 76. He testified that they sought out and used the services of Marianne Kuczynski to help them with the mortgage transaction. Tr. at 76. He testified that they used Ms. Kuczynski because she told them they would not have to pay any closing costs, that it would be a "no money out of pocket closing." Tr. at 77.

He testified that, at the time of the closing, he was working in Itasca, which is about 30 or 35 miles from Naperville, and that he drove from work to the Chicago Title office. Like his wife, Mr. Christensen described in detail the Chicago Title

Office building and parking lot, as well as the interior office space. Tr. at 79-81.

He testified that, when they arrived at the Chicago Title Company office, he and his wife both greeted the receptionist; after about 5 or 10 minutes, Ms. Kuczynski came out and escorted them back to one of the conference rooms. Tr. at 81. He testified that the room was empty when they arrived, and that the table was bare as well. Tr. at 82. He testified that, after about 15 minutes, Ms. Kuczynski came back and told them they were going to have to pay $5,000 to close. Tr. at 83. He testified that they were surprised to learn that they had to pay anything, let alone $5,000, and that they told Ms. Kuczynski that, if that was the case, they could not proceed with the transaction. Tr. at 83. He testified that Ms. Kuczynski left the room and returned about 10 to 15 minutes later and told them she had been able to get the closing costs reduced to a little over $3,000. Tr. At 83. He testified that they told Ms. Kuczynski that they still could not come up with that much money that day; he testified that Ms. Kuczynski left and returned with Lori Kovac, who told them that the closing would still go forward and that they could bring in the money at a later date. Tr. at 84. He testified that, about 30 to 40 minutes later, documents started being brought into the conference room; they were brought piecemeal and, as they showed up, he and his wife starting signing where Ms. Kovac directed

them to sign. Tr. at 84-85.

He testified that, based upon past experience, he and his
wife anticipated that the closing would take about an hour. Tr at
79.  He testified that, based on his prior closing experience, in
this case, something seemed to be amiss – there were no documents
waiting for them when they arrived in the closing room; they were
told they would not be required to pay anything to close, yet
upon arrival they learned that they had to pay about $5,000 to
close; when they advised their agent that they did not have
$5,000, the number was reduced to about $3,300; the closing took
longer than expected; etc. Tr. at 85.

Mr. Christensen testified that they left the closing without
any documents, and that his wife returned to Chicago Title on
April 16th – after they got paid – to drop off a check for the
required closing costs.  Tr. at 86-88.  He testified that his
wife called him after dropping off the check and told him that
she had received an envelope of closing documents; he testified
that she told him she took the documents home and placed them in
the filing cabinet in his home office.  Tr. at 88-89.  He
testified that no one else had access to that filing cabinet;
that he never removed any documents from the envelope; and that
he did not open the envelope until he and his wife met with an
attorney to go through the documents page by page.  Tr. at 89.

Mr. Christensen testified that he and his wife planned to go

out after the closing to celebrate getting a better interest rate, but that they cancelled their plans after the closing because it had taken so much longer than expected, and because they didn't feel they should spend money when they now had to come up with $3,300 in closing costs. Tr. at 85-86.

Mr. Christensen testified that, when he and his wife went through the documents with their attorney, they discovered that they had received just two copies of the Notice of Right to Cancel, and that, after reading the notice, he was confused as to whether they had the right to cancel, given the date on the notice; he testified that he was also confused as to the exact amount financed. Tr. at 90-91.

Mr. Christensen testified that, after meeting with their attorney, he and his wife instructed him to take whatever steps necessary to cancel the transaction; he testified that, instead of cancelling the transaction, Fifth Third instituted foreclosure proceedings, which are still pending. Tr. at 111-112. He testified that, after sending the rescission letter, he and his wife stopped making payments on the loan because they thought the loan was cancelled. Tr. at 111. He testified that they decided to consult an attorney because "the closing was bad." Tr. at 112.

With regard to his income, Mr. Christensen testified that, at the time of the closing, he worked as a system engineer for a

company called Novarra making $65,000/year.  Tr. at 78.  He

testified that he currently works as a senior director of network

operations for a company called Vapor Stream; he testified that

he makes $140,000/year plus a $20,000 bonus paid out quarterly.

Tr. at 96.  He testified that their household financial situation

is better now than it was at the time of the closing and that, if

permitted to cancel the transaction with Fifth Third, they would

be able to return the money they borrowed by obtaining another

loan.  Tr. at 97.  On cross examination, Mr. Christensen

testified that, if they were unable to obtain a loan, they had no

other assets available to pay back the unpaid principal balance

of the loan with Fifth Third Bank. Tr. at 106.

    Next, the plaintiffs called Lori Kovac, a Chicago Title

employee.  Ms. Kovac testified that, in April of 2007, she worked

as a closer for Chicago Title in the Naperville office; she

testified that she assisted with mortgage closings and handled

the signing of the documents and disbursing, as well as answering

the office phones, etc.  Trial Transcript, Volume 2 ("Tr.2"), pp.

7-8.  She testified that, although she was listed as the closer

on the Christensens' refinancing, she had no recollection of the

closing.  Tr.2 at 9, 10-11.  She testified that, although she

generally recognized the documents included in the Christensens'

closing binder, she did not generate them.  Tr.2 at 10.  She

testified that she did not generate the Truth in Lending

Statement and that she did not know whether the figures reflected
on that statement were accurate.  Tr.2 at 11.  She testified
that she was aware of the Truth in Lending Act and its
implementing regulation, Regulation Z, and that she was aware
that those statutes require that the borrowers be given certain
disclosures during the course of a closing transaction.  Tr.2 at
11-12.  She testified that, if the borrowers did not get two
copies each of the Notice of Right to Cancel, then that would be
a violation of TILA, as she understands it.  Tr.2 at 15.  She
also testified that, if the borrowers did not get the notice on
April 10th, then that would also violate the TILA.  Tr.2 at 16.
She testified that, if the borrowers didn't get the Notice until
April 16th, then that, in itself, would be a violation of the
TILA.  Tr.2 at 18.

Ms. Kovac testified that she does not remember specifically
handing two copies of the Notice of right to cancel to Mr.
Christensen; nor does she remember giving two copies to Ms. Shea.
Tr.2 at 13-14.  She testified that she does not remember the
Christensens having to pay money to close; she does not remember
that Ms. Shea had to come back with a check at a later date.
Tr.2 at 14-15.

On questioning by Fifth Third's attorney, Ms. Kovac
testified that she is not an attorney and that her testimony
regarding what would, or would not, violate the TILA comes from

16

her general understanding.  Tr.2 at 18-19.

She testified that, as a closer, her job is to "conduct the closing as agent for the lender"; she meets with the customer, presents documents, has them signed, notarizes them, makes copies and gives the customer copies of their documents.  Tr.2 at 20. She testified that the title company is responsible for preparing certain documents, such as the HUD-1 and sometimes payoff transmittals or other forms that they are required to keep in their files.  Tr.2 at 20-21.

Ms. Kovac testified that Chicago Title's policy is that, no matter how many copies of the Notice of Right to Cancel the lender provides, the closer makes the copies necessary to ensure that each signer gets two copies.  Tr.2 at 23-24.  She testified that the closer makes the copies of the signed documents after everything is signed, but that they review the package "as we are going through because we have to make sure that [the borrowers] signed everything, initialed everything, we are not missing any dates or anything like that. So, yes, as we are copying, we carefully look at it a second time."  Tr.2 at 24.  She testified that, if the lender included three copies of the Notice of Right to Cancel in the closing package, then the lender would get three copies back after the closing; she testified that, in that case, the closer would have to make an additional copy for the borrowers, so that they each got two.  Tr.2 at 24-25.

17

Ms. Kovac testified that it is not uncommon for borrowers to have to come back at a later date to bring in money to complete a closing transaction. Tr.2 at 27. She testified that, in that case, the borrowers are required to bring in the money by the funding date, which in the Christensens' case, would have been April 16th, 2007. Tr.2 at 27.

She testified that, even if the borrowers have to return with money, they would still get the closing documents at the closing; she testified that it would be extraordinary for borrowers to leave without taking closing documents with them. Tr.2 at 28. She testified that the borrowers get all their copies the day they sign. Tr.2 at 31. Ms. Kovac testified that, if the Christensens had left the closing on April 10th without documents, she would have called the lender because if they didn't get their copies it could affect their rescission. Tr.2 at 37.

After Ms. Kovac, the plaintiffs rested, and Fifth Third moved for a directed verdict; the Court denied that motion, noting that the case really turned on credibility determinations, making a directed verdict inappropriate. Tr.2 at 39. Counsel elected to file post-trial briefs in lieu of making closing arguments and the trial concluded. The parties filed their respective briefs, along with proposed findings and conclusions.

<u>CONCLUSIONS OF LAW</u>

In this case, the plaintiffs allege that Fifth Third violated the TILA in several different respects, that, because of those violations, their right of rescission was extended from three days to three years, that they properly rescinded the loan, and that the bank failed to honor that rescission. Fifth Third argues that it did not violate TILA, that the closing documents patently demonstrate the bank's compliance with the statute, and that, as a result, the rescission was untimely.

In this Circuit, borrowers may recover under the TILA even if they have not suffered any actual damages or been misled. *E.g., Washington v. Ameriquest Mortgage Co.*, No. 05 C 1007, 2006 WL 1980201, at *6 (N.D. Ill. July 11, 2006)(citing *Brown v. Marquette Savs. & Loan Ass'n*, 686 F.2d 608, 614 (7th Cir. 1982)). This is because the TILA "acts as a kind of strict liability statute": it is not enough that the lender attempted to comply with the spirit of TILA; "strict compliance with the required disclosures and terminology is required." *Id.* (citing *Smith v. No. 2 Galesburg Crown Fin. Corp.*, 615 F.2d 407, 416 (7th Cir. 1980), rev'd on other grounds, *Pridegon v. Gates Credit Union*, 683 F.2d 182 (7th Cir. 1982)). As the Seventh Circuit has instructed, when it comes to the TILA, "hypertechnicality reigns." *Smith v. Cash Store Mgmt., Inc.*, 195 F.3d 325, 328 (7th Cir. 1999).

The plaintiffs have claimed a number of TILA violations relating to the documents prepared in connection with their April 10, 2007 closing.  As explained above, they allege that the Notice of Right to Cancel was inaccurate and that the HUD-1 and TILA Disclosure Statements were inconsistent.  Although the plaintiffs are not seeking damages for these violations, the question of whether the violations occurred is relevant to the claim for which they are seeking relief – namely, their claim that Fifth Third failed to effect a rescission.  This is so because, absent the violations, the time for rescission would have passed long before the plaintiffs had their attorney send a letter cancelling the loan.

The Notice of Right to Cancel included with the Christensens closing documents instructed the plaintiffs that they had

> a legal right under federal law to cancel this transaction, without cost, within THREE BUSINESS DAYS from which of the following events occur last:
>
> (1)  The date of the transactions, which is April 10, 2007 or
> (2)  The date you received your Truth In Lending disclosure; or
> (3)  The date you received this notice of your right to cancel.

Plaintiffs' Group Exhibit 1, p. 6.  In a box in the middle of the form entitled "How To Cancel," the Notice instructs the plaintiffs that if they decide to cancel the transaction, they "may do so by notifying us in writing at:

> Fifth Third Bank, Chicago

```
        1701 Golf Road, MD GRLM8M
        Rolling Meadows, IL 60008"
```

The statement in the box further instructs that the notice must

be sent "no later than MIDNIGHT of April 13, 2007 (or MIDNIGHT of

the THIRD BUSINESS DAY following the latest of the three events

listed above)." *Id.* (emphasis in original). The July 9, 2008

rescission letter was sent to the exact address included in the

box.

The plaintiffs allege that, after they exercised their right

to cancel, Fifth Third violated the TILA by failing to take steps

to effectuate a rescission of the transaction. Under the TILA,

if a borrower "timely elects to rescind the loan, within 20 days,

the creditor must return to the borrower any earnest money, down

payment, or otherwise, and take all necessary action to reflect

termination of any security interest created by the transaction."

*Schmit v. Bank United FSB*, No. 08 C 4575, 2009 WL 320490, at *2

(N.D. Ill. Feb. 6, 2009)(citing 15 U.S.C. §1635(b)).

Initially, it is clear that Fifth Third took no steps to

effectuate a rescission of the April 2007 refinancing

transaction. The question is whether the plaintiffs' rescission

election was timely. The refinancing occurred on April 10, 2007;

that is when the plaintiffs signed the closing documents. The

transaction was funded on April 16, 2007; that is when Ms. Shea

returned to the Chicago Title office, tendered a check for

$3,312.14 to cover the spread on the closing, and, if their

testimony is believed, received the closing documents.  The rescission letter was sent on the plaintiffs' behalf on July 9, 2008, and was received by Fifth Third on July 11, 2008.

In any consumer credit transaction in which the lender retains a security interest in the borrowers' home, the borrowers have a right to rescind the transaction within a specified period of time.  15 U.S.C. §1635(a).  The right to rescind generally expires three business days after the loan "closes."  *Id.*  But if the lender fails to provide notice of the right to cancel or fails to provide the required material disclosures, the right to cancel is extended; under those circumstances, the right to cancel expires three years after the transaction is consummated. *Id.*, §1635(f); 12 C.F.R. §226.23(a)(3).

The transaction was "consummated" in April 2007.  Thus, as long as the plaintiffs can show that the three year period was triggered, the rescission was timely.  If, as the plaintiffs have argued, Fifth Third failed to provide the requisite number of copies of the notice of right to cancel, then the time for rescission would extend from three days, to three years.  *See* 15 U.S.C. §§1635(a), (f).  That would make the plaintiffs' election to rescind timely, and that would also mean that the July 9, 2008 letter would have triggered Fifth Third's obligations under §1635(b).  On the other hand, if, as Fifth Third argues, the three-day rescission period applies, the July 9, 2008 rescission

is meaningless.

Based upon the evidence adduced at trial, the Court is persuaded that the plaintiffs received their copies of the closing documents on April 16, 2007, when Ms. Shea returned to Chicago Title to tender a cashier's check for the closing costs. The testimony of Mr. Christensen and Ms. Shea was consistent on this point and the Court finds it to be credible. Although Ms. Kovac testified that it would have been extremely unusual for a borrower to leave a closing without documents, she also testified that she had no independent recollection of this closing. And the Court found her testimony on the particular aspects of this closing to be less credible than that of the plaintiffs.

The Court also finds that the plaintiffs received just three copies of the Notice of Right to Cancel – one short of the statutory requisite. Although Ms. Kovac testified that she *always* provided the statutory number of copies to borrowers, the fact that she has no specific recollection of this closing undermines that testimony to a large extent. Ms. Shea testified that, after receiving the closing documents from Chicago Title, she took the envelope home and put it in a file cabinet in their home office; she testified that she did not look at the documents until she and her husband brought the envelope to their attorney to review. She testified that she never added or removed any documents from the envelope. Mr. Christensen's testimony was

consistent with this version of events.  There is no question
that the envelope the plaintiffs received from Chicago Title
contained just three copies of the Notice of Right to Cancel.
And there is no evidence to suggest that somehow one copy was
removed or lost after Ms. Shea left Chicago Title on April 16^(th).

It is true that both plaintiffs signed the Notice of Right
to Cancel forms, under a pre-printed statement acknowledging that
they each received two copies.  But that alone is not
dispositive.  "To the contrary, TILA states that a written
acknowledgment 'does no more than create a rebuttable presumption
of delivery.'" *In re Ameriquest Mortgage Co.*, No. 05-CV-7097, MDL
No. 1715, 2006 WL 1525661, at *4 (N.D. Ill. May 30, 2006)
(quoting 15 U.S.C. § 1635(c) and citing *Briggs v. Provident Bank*,
349 F.Supp.2d 1124, 1129 (N.D. Ill. 2004)).  "Borrowers can
attempt to overcome this presumption with testimony about their
closings and what documents they received (or did not receive),
as well as by presenting copies of NORTCs from their own records.
*Id.* (citing Briggs, 349 F.Supp.2d at 1129; *Cooper v. First Gov't
Mortgage & Investors Corp.*, 238 F.Supp.2d 50, 63-65 (D.D.C.
2002); *In re Rodrigues*, 278 B.R. 683, 687-688 (Bankr.D.R.I.
2002)).  Here, the borrowers did just that.

Additionally, the Court is persuaded that the documents
provided to the borrowers at the closing were inconsistent with
respect to the amount actually financed with the mortgage.  The

24

Note the plaintiffs signed provided a promise to pay for
$312,000, suggesting that the amount financed was $312,000. *See*
Joint Exhibit E. That is consistent with the HUD-1, which states
that the principal amount of the loan is $312,000. *See* Joint
Exhibit B, p. 1. Yet, the TILA Disclosure Statement lists the
"amount financed" as $309,411.50. See Plaintiffs' Group Exhibit
1, p. 4. Although one might think the "amount financed" is
simply the principal of the loan, less the amount prepaid by the
plaintiffs on April 16, 2007, the math does not support that
notion ($312,000 - 3,312.14 = $308,687.86). These variances are
not wildly substantial, as counsel for Fifth Third pointed out at
trial, see Tr. at 62. But they certainly support the notion that
the documents caused the plaintiffs to be confused as to the
material terms of their loan, and they also support the notion
that this closing was, as the plaintiffs suspected, sketchy.

Because the dates on the Notice of Right to Cancel were
wrong, the Court finds that the Notice was deficient under the
TILA in that it failed to "clearly and conspicuously" advise the
plaintiffs of their rights with respect to rescission.
Accordingly, the Court finds that the three day rescission period
did not apply; rather, under the circumstances and consistent
with 15 U.S.C. §1635(f), 12 C.F.R. § 226.23(a)(3), the rescission
period was extended to three years. Thus, the July 2008
rescission was timely and the plaintiffs are entitled to the

relief they seek.

Conclusion

As explained more fully above, the Court finds that the plaintiffs had the right to rescind this transaction in July 2008; that their rescission, consistent with the provisions of the Notice, was effective; and that Fifth Third's failure to take steps to rescind the transaction violated the TILA.

The case is set for a status hearing on August 14, 2013 at 9:00 a.m. At that time, the parties should be prepared to discuss a timetable for the rescission of this transaction, as well as any other procedural issues relating to the rescission of this loan, the resolution of the foreclosure proceedings, etc.


Dated: August 1, 2013

E N T E R:

_____
ARLANDER KEYS
United States Magistrate Judge